UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:                          )
                                )
CHARLES A. MATHIESON,           )       Case No. 13-10343
                                )          Chapter 7
            Debtor              )

**REAFFIRMATION AGREEMENT COVER SHEET**

This form must be completed in its entirety and filed, with the reaffirmation agreement attached, within the time set under Rule 4008.  It may be filed by any party to the reaffirmation agreement.

1.  Creditor's Name: Bar Harbor Bank & Trust

2.  Amount of the debt subject to this reaffirmation agreement:
    $254,949.95   on the date of bankruptcy
    $261,183.48   to be paid under reaffirmation agreement

3.  Annual percentage rate of interest:
    3.625% prior to bankruptcy
    5.00% under reaffirmation agreement (fixed rate)

4.  Repayment terms (if fixed rate):
    $1,750.32 due on the 15th of the month; with the next payment due October 15, 2013

5.  Collateral, if any, securing the debt: Current market value:
    $150,000.00
    Description:
    Real estate located at 85 Port Clyde Road in Tenants Harbor, Maine

6.  Does the creditor assert that the debt is nondischargeable?
    ___ Yes   X   No
(If yes, attach a declaration setting forth the nature of the debt and basis for the contention that the debt is nondischargeable.)

<u>Debtor's Schedule I and J Entries</u>

<u>Debtor's Income and Expenses as Stated on Reaffirmation Agreement</u>

7A.  Total monthly income from (Schedule I, line 16)
$<u>4,867.59</u>

7B.  Monthly income from all sources after payroll deductions
$<u>4,867.59</u>

8A.  Total monthly expenses from Schedule J, line 18
$<u>4,863.23</u>

8B.  Monthly expenses
$<u>4,863.23</u>

9A. Total monthly payments on reaffirmed debts not listed on Schedule J
$<u>0.00 </u>

9B.  Total monthly payments on reaffirmed debts not  included in monthly expenses
$<u>0.00 </u>

10B. Net monthly income
$<u> 4.36 </u>
(Subtract sum of lines 8B and 9B from line 7B.  If total is less than zero, put the number in brackets.)

11. Explain with specificity any difference between the income amounts (7A and 7B):

_____
_____

12. Explain with specificity any difference between the expense amounts (8A and 8B):

_____
_____

    If line 11 or 12 is completed, the undersigned debtor and joint debtor if applicable, certifies that any explanation contained on those lines is true and correct.


/s/ Charles A. Mathieson                    _____
Signature of Debtor                         Signature of Joint Debtor
Charles A. Mathieson


Other Information

☐    Check this box if the total on line 10B is less than zero. If that number is less than zero, a presumption of undue hardship

arises (unless the creditor is a credit union) and you must
explain with specificity the sources of funds available to the
Debtors to make the monthly payments on the reaffirmed debt:

_____
_____

Were debtors represented by counsel during the course of
negotiating this reaffirmation agreement?


     __X__ Yes              _____ No


If debtors were represented by counsel during the course of
negotiating this reaffirmation agreement, has counsel executed a
certification (affidavit or declaration) in support of the
reaffirmation agreement?


     __X__ Yes              _____ No


### FILER'S CERTIFICATION

     I hereby certify that the attached agreement is a true and
correct copy of the reaffirmation agreement between the parties
identified on this Reaffirmation Agreement Cover Sheet.


/s/ Michael S. Haenn
Michael S. Haenn, Esq.
Attorney for
Bar Harbor Bank & Trust

```
Check one:
☐ Presumption of Undue Hardship
■ No Presumption of Undue Hardship
(See Debtor's Statement in Support of
Reaffirmation, Part II below, to
determine which box to check
```

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:                          )
                                )
CHARLES A. MATHIESON,           )        Case No. 13-10343
                                )           Chapter 7
        Debtor                  )


<u>**REAFFIRMATION AGREEMENT**</u>
*[Indicate all documents included in this filing by checking
each applicable box]*


■    Part A: Disclosures, Instructions, and Notice to Debtor
■    Part B: Reaffirmation Agreement
■    Part C: Certification by Debtor's Attorney
■    Part D: Debtor's Statement in Support of Reaffirmation
     Agreement
☐    Part E:  Motion for Court Approval

[**Note:** *Complete Part E only if debtor was not represented by
an attorney during the course of negotiating this agreement.*
***Note also:*** *If you complete Part E, you must prepare and file
Form 240C ALT- Order on Reaffirmation Agreement.]*

**Name of Creditor: BAR HARBOR BANK & TRUST**

☐ *[Check this box if ]* Creditor is a Credit Union as defined in
§ 199b)(1)(a)(iv) of the Federal Reserve Act

**PART A: DISCLOSURE STATEMENT, INSTRUCTIONS AND NOTICE TO DEBTOR**

   **1.   DISCLOSURE STATEMENT**

   ***Before Agreeing to Reaffirm a Debt, Review These Important
Disclosures:***

   **SUMMARY OF REAFFIRMATION AGREEMENT**

This Summary is made pursuant to the requirements of the Bankruptcy Code.

**AMOUNT REAFFIRMED**:

The amount of debt you have agreed to reaffirm:   **$261,183.48**
                                                   **(As of 9/27/13)**

*The amount of debt you have agreed to reaffirm includes all fees and costs (if any) that have accrued as the date of this disclosure. Your credit agreement may obligate you to pay additional amounts which may come due after the date of this disclosure. Consult your credit agreement.*

**ANNUAL PERCENTAGE RATE**

*[The annual percentage rate can be disclosed in different ways, depending on the type of debt.]*

a.   If the debt is an extension of "credit" under an "open end credit plan," as those terms are defined in § 103 of the Truth in Lending Act, such as a credit card, the creditor may disclose the annual percentage rate shown in (I) below or, to the extent this rate is not readily available or not applicable, the simple interest rate shown in (ii) below, or both.

(I)   The Annual Percentage Rate disclosed, or that would have been disclosed, to the debtor in the most recent periodic statement prior to entering into the reaffirmation agreement described in Part B Below or, if no such periodic statement was given to the debtor during the prior six months, the annual percentage rate as it would have been so disclosed at the time of the disclosure statement: _____%

- - -*And/Or*- - -

(ii)   The simple interest rate applicable to the amount reaffirmed as of the date this disclosure statement is given to the debtor: _5.00_%.  If different simple interest rates apply to different balances included in the amount reaffirmed, the amount of each balance and the rate applicable to it are:

$ _____ @ _____%;

$ _____ @ _____%;

$ _____ @ _____%;

2

b.    If the debt is an extension of credit other than under than an open end credit plan, the creditor may disclose the annual percentage rate shown in (I) below, or, to the extent this rate is not readily available or not applicable, the simple interest rate shown in (ii) below, or both.

(I)  The Annual Percentage Rate under §128(a)(4) Truth in Lending Act, as disclosed to the debtor in the most recent disclosure statement given to the debtor prior to entering into the reaffirmation agreement with respect to the debt or, if no such disclosure statement was given to the debtor, the annual percentage rate as it would have been so disclosed: _____%.

- - -And/Or- - -

(ii) The simple interest rate applicable to the amount reaffirmed as of the date this disclosure statement is given to the debtor: _____%. If different simple interest rates apply to different balances included in the amount reaffirmed, the amount of each balance and the rate applicable to it are:

$ _____ @ _____%;
$ _____ @ _____%;
$ _____ @ _____%;

c. If the underlying debt transaction was disclosed as a variable rate transaction on the most recent disclosure given under the Truth in Lending Act:

The interest rate on your loan may be a variable interest rate which changes from time to time, so that the annual percentage rate disclosed here may be higher or lower.

d. If the reaffirmation debt is secured by a security interest or lien, which has not been waived or determined to be void by a final order of the court, the following items or types of items of the debtor's goods or property remain subject to such security interest or lien in connection with the debt or debts being reaffirmed in the reaffirmation agreement described in Part B.

| Item or Type of Item | Original Purchase Price or **Original Amount of Loan** |
|---|---|
| **Real Estate located at 85 Port Clyde Road, Tenants Harbor, Maine** | **$268,000.00** |

3

*Optional*- - -*At the election of the creditor, a repayment schedule using one or a combination of the following may be provided:*

### Repayment Schedule:

Your first payment in the amount of $_____ is due on _____, but the future payment amount may be different. Consult your reaffirmation agreement or credit agreement, as applicable.

—Or—

Your payment schedule will be: 360 payments in the amount of $1,750.32 each, payable in monthly installments with the next payment due on October 15, 2013, unless altered later by mutual agreement in writing.

—Or—

A reasonably specific description of the debtor's repayment obligations to the extent known by the creditor or creditor's representative.

### 2. INSTRUCTIONS AND NOTICE TO DEBTOR

**Reaffirming a debt is a serious financial decision.** The law requires you to take certain steps to make sure the decision is in your best interest. If these steps are not completed, the reaffirmation agreement is not effective, even though you have signed it.

1. Read the disclosures in this Part A carefully. Consider the decision to reaffirm carefully. Then, if you want to reaffirm, sign the reaffirmation agreement in Part B (or you may use a separate agreement you and your creditor agree on).

2. Complete and sign Part D and be sure you can afford to make the payments you are agreeing to make and have received a copy of the disclosure statement and a completed and signed reaffirmation agreement.

3. If you were represented by an attorney during the negotiation of your reaffirmation agreement, the attorney must have signed the certification in Part C.

4. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, you must have completed and signed Part E.

5. The original of this disclosure must be filed with the

4

court by you or your creditor. If a separate reaffirmation agreement (other than the one in Part B) has been signed, it must be attached.

6. If the creditor is not a Credit Union and you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court unless the reaffirmation is presumed to be an undue hardship as explained in Part D. If the creditor is a Credit Union and you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court.

7. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, it will not be effective unless the court approves it. The court will notify you and the creditor of the hearing on your reaffirmation agreement. You must attend this hearing in bankruptcy court where the judge will review your reaffirmation agreement. The bankruptcy court must approve your reaffirmation agreement as consistent with your best interest, except that no court approval is required if your reaffirmation agreement is for a consumer debt secured by a mortgage, deed of trust, security deed, or other lien on your real property, like your home.

**YOUR RIGHT TO RESCIND (CANCEL) YOUR REAFFIRMATION AGREEMENT**
You may rescind (cancel) your reaffirmation agreement at any time before the bankruptcy court enters a discharge order, or before the expiration of the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later. To rescind (cancel) your reaffirmation agreement, you must notify the creditor that your reaffirmation agreement is rescinded (or canceled).

**Frequently Asked Questions:**

What are your obligations if you reaffirm a debt? A reaffirmed debt remains your personal legal obligation to pay. Your reaffirmed debt is not discharged in your bankruptcy case. That means that if you default on your reaffirmed debt after your bankruptcy case is over, your creditor may be able to take your property or your wages.  Your obligations will be determined by the reaffirmation agreement, which may have changed the terms of the original agreement.  If you are reaffirming an open end credit agreement, that agreement or applicable law may permit the creditor to change the terms of that agreement in the future under certain conditions.

<u>Are you required to enter into a reaffirmation agreement by any law?</u> No, you are not required to reaffirm a debt by any law. Only agree to reaffirm a debt if it is in your best interest. Be sure you can afford the payments that you agree to make.

<u>What if your creditor has a security interest or lien?</u> Your bankruptcy discharge does not eliminate any lien on your property. A "lien" is often referred to as a security interest, deed of trust, mortgage, or security deed. The property subject to a lien is often referred to as collateral. Even if you do not reaffirm and your personal liability on the debt is discharged, your creditor may still have a right under the lien to take the collateral if you do not pay or default on the debt. If the collateral is personal property that is exempt or that the trustee has abandoned, you may be able to redeem the item rather than reaffirm the debt. To redeem, you make a single payment to the creditor equal to the current value of the collateral, as the parties agree or the court determines.

> **NOTE:** When this disclosure refers to what a creditor "may" do, it does not use the word "may" to give the creditor specific permission. The word "may" is used to tell you what might occur if the law permits the creditor to take the action. If you have questions about your reaffirming a debt or what the law requires, consult with the attorney who helped you negotiate this agreement reaffirming a debt. If you don't have an attorney helping you, the judge will explain the effect of your reaffirming a debt when the hearing on the reaffirmation agreement is held.

**PART B: REAFFIRMATION AGREEMENT.**

I (we) agree to reaffirm the debts arising under the credit agreement described below.

1. Brief description of credit agreement:

<u>Promissory note dated October 28, 2004 in the original principal amount of $268,000.00 executed by the Debtor. Amendment to Terms of Loan dated contemporaneously with this Agreement and executed by the Debtor and Creditor. Mortgage deed dated October 28, 2004 executed by the Debtor and recorded in the Knox Registry of Deeds in Vol. 3322, Page 270.</u>

2. Description of any changes to the credit agreement made as part of this reaffirmation agreement:

<u>None other than the Amendment to Terms of Loan stated above.</u>

6

SIGNATURES:


Borrower:                          Accepted by Creditor:



/s/ Charles A. Mathieson          /s/ Stacie J. Alley
Charles A. Mathieson              Stacie J. Alley, Asst. VP
Debtor                            Bar Harbor Bank & Trust
                                  P.O. Box 1089
                                  Ellsworth, ME 04605



Dated: October 10, 2013


Co-Borrower, if also reaffirming these debts:   N/A


Date of creditor acceptance: October 17, 2013

## PART C: CERTIFICATION BY DEBTOR'S ATTORNEY (IF ANY)

*[To be filed only if the attorney represented the debtor during the course of negotiating this agreement.]*

I hereby certify that (1) this agreement represents a fully informed and voluntary agreement by the debtor; (2) this agreement does not impose an undue hardship on the debtor or any dependent of the debtor; and (3) I have fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement.

☐ *[Check box, if applicable and the creditor is not a Credit Union.]* A presumption of undue hardship has been established with respect to this agreement. In my opinion, however, the debtor is able to make the required payment.

Printed Name of Debtor's Attorney: Richard P. Olson

Signature of Debtor's Attorney:   /s/ Richard P. Olson

Dated:   October 10, 2013

7

**PART D: DEBTOR'S STATEMENT IN SUPPORT OF REAFFIRMATION
AGREEMENT**

*[Read and complete sections 1 and 2,* **OR***, if the creditor is a
Credit Union and the debtor is represented by an attorney, read
section 3. Sign the appropriate signature line(s) and date your
signature. If you complete sections 1 and 2* **and** *your income less
monthly expenses does not leave enough to make the payments under this
reaffirmation agreement, check the box at the top of page 1 indicating
"Presumption of Undue Hardship." Otherwise, check the box at the top
of page 1 indicating "No Presumption of Undue Hardship"]*

1. I believe this reaffirmation agreement will not impose an
undue hardship on my dependents or me.  I can afford to make the
payments on the reaffirmed debt because my monthly income (take
home pay plus any other income received) is $4,867.59, and my
actual current monthly expenses including monthly payments on
post-bankruptcy debt and other reaffirmation agreements total
$3,112.91, leaving $1,754.68 to make the required payments on
this reaffirmed debt.

I understand that if my income less my monthly expenses does
not leave enough to make the payments, this reaffirmation
agreement is presumed to be an undue hardship on me and must be
reviewed by the court. However, this presumption may be overcome
if I explain to the satisfaction of the court how I can afford to
make the payments here:_____
_____
_____.
**(Use an additional page if needed for a full explanation)**

2. I received a copy of the Reaffirmation Disclosure
Statement in Part A and a completed and signed reaffirmation
agreement.

Signed: /s/ Charles A. Mathieson
          Charles A. Mathieson


Dated:   October 10, 2013

                        —Or—

*[If the creditor is a Credit Union and the debtor is represented
by an attorney]*

3. I believe this reaffirmation agreement is in my financial
interest.  I can afford to make the payments on the reaffirmed
debt. I received a copy of the Reaffirmation Disclosure Statement

in Part A and a completed and signed reaffirmation agreement.

Signed: _____

(Debtor)

_____

(Joint Debtor, if any)

Dated: _____

Mathieson, Charles A.
0044

# ADJUSTABLE RATE NOTE
### (1 Year Treasury Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

October 28, 2004                    Rockland                    Maine
[Date]                              [City]                      [State]

85 Port Clyde Road Tenants Harbor, ME 04860
Norton Drive, South Thomaston, ME 04858
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **268,000.00**          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Bar Harbor Bank & Trust**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          **7.375** %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on **December 1st, 2004** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 1st, 2034**     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **11 Avery Lane Ellsworth, ME 04605** or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,851.01**          . This amount may change.

#### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE ADJUSTABLE RATE NOTE - ARM 5-2 - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3502 1/01
Fannie Mae 4-2/5-2/6-2 ARM

*VMP®* -822N (0009).01

VMP MORTGAGE FORMS - (800)521-7291

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of November 2007                  , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding    THREE  AND  500/1000 percentage points (                  3.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than                  9.375 % or less than            5.375 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than            13.375 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from

me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    **FIFTEEN**    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **4.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as

this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
Charles A. Mathieson            -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                      -Borrower

*[Sign Original Only]*

### ADDENDUM TO MORTGAGE NOTE TO BAR HARBOR BANK & TRUST
### DATED October 28, 2004
### Charles A. Mathieson
### 85 Port Clyde Road, Tenants Harbor, ME 04860
### Norton Drive, South Thomaston, ME 04858

The Mortgage Note dated October 28, 2004 in the amount of $268,000 is hereby amended to add the following condition:  Bar Harbor Bank & Trust will not consider a reduction of the interest rate on this Note until the monthly payments of principal and interest have been paid as agreed and all other conditions of the Note and Mortgage Deed have been met for 24 consecutive payments.  All other terms and conditions of the Mortgage Note and Mortgage Deed remain the same.

BAR HARBOR BANK & TRUST

By: _____
Melissa M. Gray

_____
Charles A. Mathieson

## AMENDMENT TO TERMS OF
## Loan / Note #▇▇▇▇▇

**Charles A. Mathieson**, of Tenants Harbor, Maine ("Borrower"), and **Bar Harbor Bank & Trust** ("Lender"), the latter being the holder of a promissory note executed by Borrower described hereinbelow ("the Note"); do hereby agree to an amendment of the terms of the Note as follows:

### Note description
**Dated:**  October 28, 2004
**Original Principal Amount:**  $268,000.00
**Outstanding Loan Balance:**  $261,183.48

### Modification
The Outstanding Loan Balance shall be paid to Lender in 360 consecutive monthly installments of not less than $1,402.09 commencing on October 15, 2013.  Borrower recognizes and agrees that the Outstanding Loan Balance includes capitalized interest, late charges, legal fees and costs, property taxes paid by Lender, and other sums due to Lender pursuant to the Note or related documentation ("the Loan Documents"), and accepts such proposed debt retirement schedule in light of his inability to address the Note obligation in any other manner acceptable to Lender.

If not sooner paid, the entire outstanding balance of the Note shall be paid (including accruing interest and all late charges as accrue after the date of this instrument) not later than October 15, 2043.

### Interest Accrual
Interest shall accrue on the Outstanding Loan Balance at the fixed rate of five percent (5%) per annum, effective as of the date of this instrument.  Interest shall be calculated and computed on the basis of an actual/360 day year, with the per diem interest rate calculated by dividing the interest rate by 360 days.

### Municipal Assessments
Borrower shall fund an escrow for the assessments described in the mortgage deed described in "Collateral", below, and at paragraph (3) of said mortgage deed.  Such escrow, to be adjusted and funded in the manner set forth in the mortgage deed at paragraph (3), shall be initially funded by monthly installments of $348.23 each commencing on October 15, 2013.  Thereafter the escrow shall be at all times funded by Borrower consistent with the Mortgage.

### Contingent Reinstatement of Note
Borrower expressly agrees as follows:
(a) Borrower has failed to tender payments to Lender pursuant to the terms of the Note and which terms have not in any

manner been amended prior to the date of this instrument.

(b) Lender commenced an action in the Maine District Court
(at Rockland) docketed as Docket No. ROC-RE-2011-76, and a
judgment of foreclosure [14 M.R.S.A. § 6321 et seq.] ("the
Judgment") entered.

(c) Borrower does not intend for any payment to Lender made
at any time prior to November 30, 2014 to effect a waiver of any
right or remedy of Lender and particularly a waiver of any right
or remedy of Lender pursuant to the Judgment.

(d) Lender agrees that for so long as Borrower complies with
the terms of this instrument Lender shall not exercise its rights
under or pursuant to the Judgment; and that upon the complete
satisfaction of each and every obligation of Borrower as provided
in this instrument and as may accrue through November 1, 2014,
Lender shall waive its rights under the Judgment; and that in the
event Borrower is in default of the terms of this instrument at
any time prior to November 1, 2014 Lender may immediately and
without notice proceed to enforce its rights and remedies
pursuant to the Judgment.

## Limited Applicability

The terms of this instrument are without effect upon, and
shall not mitigate, modify, amend or reduce, any other obligation
of Borrower to Lender other than as specifically provided herein,
and then only as specifically set forth in this instrument.

## Severability

Each covenant and agreement by Borrower contained in this
instrument shall be construed, absent an express contrary
provision, as being independent of each other agreement and
covenant contained herein, and compliance with any one provision
contained herein shall not, absent an express contrary provision,
be deemed to excuse compliance with any and all other covenants
and agreements.   The invalidity or unenforceability of any
particular provision of the Note, as may be determined by a court
of competent jurisdiction, shall not affect the remaining
obligations of the parties hereto or the validity or
enforceability of all other obligations of the parties hereto.
To the extent any provision herein is determined by a court of
competent jurisdiction to be unenforceable, the parties agree to
affirmatively solicit such construction of such unenforceable
provision as will yield to Lender the most advantageous
construction of such provision, consistent with the tone, tenor
and purpose of the Note, as may be possible.

## Collateral

Borrower acknowledges that the Outstanding Loan Balance is
and shall remain secured and collateralized by the mortgage deed
dated October 28, 2004 and recorded in the Knox Registry of Deeds
in Vol. 3322, Page 270.

## Incorporation by Reference

Except as expressly modified hereby, each of the terms,

conditions and provisions of the Note shall remain in full force
and effect, and Borrower shall remain fully liable therefor.

     In witness whereof, the parties hereto have executed or
caused this instrument to be executed by their duly authorized
officers as of this ᴵ₀ₜₕ day of October, 2013.

Witness:

_____        _____
                                       Charles A. Mathieson
                                       BORROWER

Witness:                               **BAR HARBOR BANK & TRUST**

_____        By_____
                                       Stacie J. Alley
                                       Its Asst. Vice President
                                       LENDER

State of Maine
Knox, ss.                              October  10 , 2013

     Personally appeared the above-named Charles A. Mathieson and
acknowledged the foregoing instrument by him signed to be his
free act and deed.

     Before me,

                                       _____
                                       Notary Public
                                            JEANNETTE M. MORAN
                                            Notary Public, Maine
                                            My Commission Expires February 22, 2015

Return To:

Bar Harbor Bank & Trust
82 Main Street
Bar Harbor, ME 04609

Prepared By:

Amanda Salsbury
82 Main Street
Bar Harbor, ME 04609

Doc# 14635
Bk: 3322 Pg: 270

——————————————————[Space Above This Line For Recording Data]——————————————————

# MORTGAGE

**WORDS USED OFTEN IN THIS DOCUMENT**
Words used in multiple sections of this document are defined below. Other words are defined in Sections
3, 5, 8, 10, 11, 13, 18, 20 and 21. Certain rules about the usage of words used in this document are also
provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated October 28th, 2004
The term "Security Instrument" includes any Riders recorded with the Security Instrument.
**(B) "Borrower"** means  Charles A. Mathieson

who sometimes will be called "Borrower" and sometimes simply "I" or "me." "Borrower" is granting a
mortgage under this Security Instrument. "Borrower" is not necessarily the same as the Person or Persons
who signed the Note. The obligations of Borrowers who did not sign the Note are explained further in
Section 13.
**(C) "Lender"** means  Bar Harbor Bank & Trust

MAINE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3020  1/01

VMP®-6(ME) (0011).01
Page 1 of 17                                        Initials
        VMP MORTGAGE FORMS - (800)521-7291

Doc#
Bk: 3322 Pg: 271
14635

Lender is a corporation or association which exists under the laws of The State of Maine
. Lender's address is 82 Main Street, Bar
Harbor, ME 04609

Except as provided in Sections 13 and 20, the term "Lender" may include any Person who takes ownership
of the Note and this Security Instrument.
(D) "Note" means the note signed by   Charles A. Mathieson

and dated 10/28/2004           . The Note shows that its signer or signers owe Lender
   TWO HUNDRED SIXTY EIGHT   THOUSAND   AND 00/100

Dollars (U.S. $268,000.00           ) plus interest and promise to pay this debt in Periodic
Payments and to pay the debt in full by November 1, 2034          .
(E) "Property" means the property that is described below in the section titled "Description of the
Property" or any portion of the Property.
(F) "Sums Secured" means the unpaid balance of amounts described below in the section titled
"Borrower's Transfer to Lender of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider             ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                  ☐ Biweekly Payment Rider     ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any monies or other thing of value paid by any third party, other
than insurance proceeds paid under the coverages described in Section 5, for: (i) damage to, or destruction
of, the Property; (ii) Condemnation or other taking of all or any part of the Property (see Section 11 for an
explanation of "Condemnation"); (iii) conveyance in lieu of Condemnation; or (iv) misrepresentations of,
or omissions as to, the value and/or condition of the Property.

Doc#
Bk: 3322  14635  Pg:    272

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of the Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. When this Security Instrument refers to a requirement or restriction under "RESPA," Lender intends to abide by that requirement or restriction, even if it is not technically applicable to the Loan.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(R) "Ground Rents"** means amounts I owe if I rented the real property under the buildings covered by this Security Instrument. Such an arrangement usually takes the form of a long-term "ground lease."

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender, with mortgage covenants, subject to the terms of this Security Instrument, to have and to hold all of the Property to Lender, and to its successors and assigns, forever. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to Lenders who hold mortgages on real property. Those rights that Applicable Law gives to Lenders who hold mortgages on real property include those rights known as "Mortgage Covenants." I am giving Lender these rights to protect Lender from possible losses that might result if:

    (A) Some or all of the Loan is not paid when due;

    (B) I fail to pay, with interest, any amounts that Lender spends under Section 9 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; or

    (C) I fail to keep any of my other promises and agreements under this Security Instrument.

These amounts are the "Sums Secured."

## DESCRIPTION OF THE PROPERTY

I grant and mortgage to Lender the Property described in (A) through (G) below:

    (A) The Property which is located at **85 Port Clyde Road**

                                           [Street]

**Tenants Harbor**                    [City] , Maine **04860**          [Zip Code]

("Property Address"). This Property is in **Knox**                  County.

It has the following legal description:

**SEE ATTACHED EXHIBIT A**

Parcel ID Number:

Doc# 14635
Bk: 3322 Pg: 273

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains promises and agreements that vary, to a limited extent, in different parts of the country. My promises and other agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** If I signed the Note, I will pay to Lender when due principal and interest due under the Note and any prepayment charges and late charges due under the Note. Regardless of whether I signed the Note, I will pay funds for Escrow Items as described in Section 3. I will make all payments in U.S. currency. If any Borrower makes any Loan payment to Lender with a check or other instrument that is returned for any reason (i.e., the check bounces), except when prohibited by Applicable Law, the Lender may require that any subsequent payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check (all of which must be drawn on an institution whose deposits are insured by a federal agency, instrumentality, or entity); or (d) Electronic Funds Transfer. Lender may reasonably specify which payment form is required.

Payments are only considered received when they reach the Lender's address specified in the Note, or a different address specified by Lender under Section 15 of this Security Instrument. Lender may return any payments or partial payments if the payments are insufficient to bring the Loan current. Lender may accept any payments or partial payments insufficient to bring the Loan current, but doing so will not affect Lender's rights under this Security Instrument, and Lender may still refuse such late, partial payments in the future.

I agree that no claim or legal right I may have against the Lender will excuse my obligation to make timely payments under the Loan or to keep my other promises in this Security Instrument.

Doc#
Bk: 3322 Pg: 14635    274

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender will be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts payable under Section 3. Such payments will be applied to each Periodic Payment in the order in which it became due. Any remaining amounts will be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from me for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent Periodic Payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from me to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary extra payments must be applied first to any charges for making voluntary extra payments and then as described in the Note.

If voluntary extra payments I may make or the crediting of insurance proceeds or Miscellaneous Proceeds to the Note are enough to pay principal ahead of schedule, I must still make my regularly scheduled Periodic Payments under the Note, when scheduled, without any delay or reduction of amount.

**3. Monthly Payments for Taxes and Insurance.**

**(a) Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a loss reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward the payment of the following items, which are called "Escrow Items:"

(1) The taxes, assessments and other items which under the Applicable Law may be or become superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien;"

(2) The leasehold payment or Ground Rents on the Property (if any);

(3) The premium for insurance covering the Property required under Section 5;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 below instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If Lender requires, Community Association Dues, Fees, and Assessments.

After signing of the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment that I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

I will promptly send Lender a copy of all notices of amounts to be paid under this Section. I must pay Lender for Escrow Items as part of my regular Periodic Payments, unless Lender excuses this requirement in writing. If Lender excuses me in writing, I will pay all Escrow Items covered by the excuse, directly and on time. I will provide receipts proving my direct payments of Escrow Items on request and in the time period Lender requires. If Lender excuses me from paying Escrow Items to Lender and if I fail to pay any amount due for an Escrow Item directly, Lender may pay such amount under Section 9, and I will be obligated to repay Lender, plus interest at the Note rate. Lender may revoke the excuse regarding any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, I will pay to Lender all Funds (defined below), and in such amounts, that are then required under this Section 3.

Doc#
Bk: 3322 14635 Pg: 275

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called the "Funds." The Funds are pledged as additional security for all Sums Secured.

Lender may, at any time, collect and hold Funds in an amount (1) sufficient to permit Lender to apply the Funds at the time specified under RESPA, but (2) not to exceed the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

**(b) Lender's Obligation.** Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction in the manner required by RESPA.

Lender may not charge me for holding or keeping the Funds, or for using the Funds to pay Escrow Items, or for making a yearly analysis of my payment of Funds or for receiving, verifying and totaling assessments and bills. Maine law requires payment of, and Lender agrees to pay me, interest on the Funds in the manner and amount set forth in Maine law.

**(c) Adjustments to the Funds.** If there is a surplus of Funds held in escrow, as defined under RESPA, Lender will report to me regarding the excess funds in accordance with RESPA. If there is a shortage or deficiency of Funds held in escrow, as defined under RESPA, Lender will notify me as required by RESPA and I will pay to Lender the amount necessary to make up the shortage or deficiency as required by RESPA, but in no more than 12 monthly payments.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be or become superior to this Security Instrument. If I am a tenant under a ground lease on the Property, I will also pay Ground Rents or payments due under my ground lease. I will also pay any Community Association Dues, Fees, and Assessments. I will do this either by making the payments to Lender that are described in Section 3 above or, if I am not required to make payments to Lender under Section 3, by making the payments on time to the Person owed them. In this Security Instrument, the word "Person" means any natural person, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be or become superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation (but I must fully perform my agreement or this exception does not apply); (b) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced (but this exception ends when the lawsuit ends); or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance; Use of Insurance Proceeds.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by: (a) fire; (b) hazards normally covered by "extended coverage" hazard insurance policies; and (c) other hazards for which Lender requires coverage, including floods and earthquakes. The

Initials: 

 -6(ME) (0011).01                    Page 6 of 17                    Form 3020   1/01

Doc# 14635
Bk: 3322 Pg: 276

insurance must be in the amounts (including deductibles) and for the periods of time required by Lender. Lender's requirements can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. If I do not maintain any of the insurance coverages described above, Lender may obtain insurance coverage at its option and charge me in accordance with Section 9 below.

Lender is under no obligation to purchase any particular type or amount of coverage. Lender's coverage will protect Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the Lender's insurance coverage might significantly exceed the cost of insurance that I could have obtained. Any amounts paid by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with interest, upon notice from Lender to me requesting payment.

Lender may require me to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. I will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from my objection.

All of the insurance policies required by Lender and renewals of those policies: (a) are subject to Lender's right to disapprove; (b) must include what is known as a "standard mortgage clause" to protect Lender; and (c) must name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewal certificates must be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts for paid premiums and renewal notices that I receive.

If I obtain additional insurance for damage to or destruction of the Property not required by Lender, I will ensure that it contains a standard mortgage clause and names Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by any insurance company with regard to the Property is called "Proceeds." The Proceeds will be used to repair or to restore the damaged Property whether or not the underlying insurance was required by Lender unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Proceeds will be used to pay the Sums Secured. If any of the Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Proceeds will be paid to me. Such insurance proceeds will be applied in the order provided for in Section 2.

During the repair and restoration period, Lender will have the right to hold insurance proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction. Lender will arrange the inspection promptly. Lender may disburse Proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender will not be required to pay me any interest or earnings on Proceeds. Fees for public adjusters, or other third parties I retain, will not be paid out of the insurance proceeds and will be my sole obligation.

Doc# 14635
Bk: 3322 Pg: 277

If I abandon the Property, or if I do not answer, within 30 days a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle any insurance claim. The 30-day period will begin when the notice is given.

If I abandon the Property, do not answer the notice, or if Lender acquires the Property under Section 22 below or otherwise, all of my rights in all insurance policies covering the Property will belong to Lender, other than the right to any refund of unearned premiums I have paid. Lender may use the insurance proceeds either to repair or restore the Property or to pay the Sums Secured, whether or not then due. However, Lender's rights in those Proceeds will not be greater than the Sums Secured.

**6. Occupancy.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligation to Maintain and Protect the Property; Inspections.** I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate or diminish in value due to its condition whether or not I am residing in the Property. In addition, I will promptly repair the Property, if damaged, to avoid further deterioration or damage unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, I will be responsible for repairing or restoring the Property only if Lender has released Proceeds for such purposes. Lender may disburse Proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, I will not be relieved of my obligation to complete such repair or restoration.

Lender or its agents may enter and inspect the Property at reasonable times. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give me notice prior to an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I made false, misleading, incomplete, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan ("Material Information"), Lender will treat my actions as a default under this Security Instrument. I will also be in default if I knew about or consented to any other Person giving false, misleading, incomplete, or inaccurate statements about Material Information to Lender. False, misleading, incomplete, or inaccurate statements about Material Information would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, incomplete, or inaccurate statement of Material Information. Also, if during the loan application process I failed to provide Lender with Material Information, Lender will treat this as a default under this Security Instrument. I will also be in default if I knew about or consented to any other Person failing to provide Lender with Material Information.

**9. Lender's Right to Protect its Rights in the Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture, for enforcement of a lien which may become superior to this Security Instrument or to enforce laws or regulations); or (c) I abandon the Property, then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, may include

Initials:

Doc#
Bk: 3322 14635
Pg: 278

appearing in court, paying reasonable attorneys' fees, paying superior liens on the Property, protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Securing the Property includes, for example, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. I agree that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Note rate. Interest on each amount will begin on the date that the amount is spent by Lender.

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I subsequently purchase or otherwise become the owner of the Property, my interest as the tenant and my interest as the owner will remain separate unless Lender agrees in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage required by Lender lapses or ceases to be available from the original mortgage insurer, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available and if I was required to make separately designated payments toward the premiums for Mortgage Insurance, Lender will establish a loss reserve as a substitute for the Mortgage Insurance coverage. I will pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. Such loss reserve will not be refundable.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage again becomes available and is obtained. In that case, I will once again make Mortgage Insurance premiums. The Mortgage Insurance coverage must be in the amount and for the period of time required by Lender. Lender must approve the insurance company providing the coverage.

I will pay the Mortgage Insurance premiums, or the non-refundable loss reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in this Section 10.

This Section 10, and the existence or termination of my obligation to pay Mortgage Insurance premiums or reserve payments, does not affect my obligation to pay interest under the Note at the rate set by the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity, may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding

Initials: _____

Doc #
Bk : 3322 14635
Pg : 279

the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements about Miscellaneous Proceeds and Condemnation of the Property.** I assign to Lender all Miscellaneous Proceeds (as defined above in subsection (M) of the section entitled "Words Used Often In This Document"). All Miscellaneous Proceeds will be paid to Lender. Miscellaneous Proceeds include, among other things, awards or claims for damages for Condemnation. A taking of property by any governmental authority by eminent domain is known as "Condemnation."

If the Property is damaged, all Miscellaneous Proceeds will be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During the repair and restoration period, Lender will have the right to hold Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction. Lender will arrange the inspection promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Miscellaneous Proceeds, Lender will not be required to pay me any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured by this Security Instrument, whether or not then due, with the excess, if any, paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

If all of the Property is taken or destroyed, the Miscellaneous Proceeds will be used to reduce the Sums Secured, whether or not then due. If any of the Miscellaneous Proceeds remain after the Loan has been paid in full, the remaining proceeds will be paid to me.

Unless Lender and I agree otherwise in writing, if only a part of the Property is taken or destroyed, and the fair market value of the Property immediately before the partial taking or destruction either is equal to, or greater than, the amount of the Sums Secured immediately before the partial taking or destruction, then a portion of the Miscellaneous Proceeds will be applied to pay a portion of the Loan. That portion will equal the Miscellaneous Proceeds multiplied by a fraction. That fraction is as follows: (a) the total amount of the Sums Secured immediately before the partial taking or destruction; divided by (b) the fair market value of the Property immediately before the partial taking or destruction. The remainder of the Miscellaneous Proceeds will be paid to me.

Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, if only a part of the Property is taken or destroyed, and the fair market value of the Property immediately before the partial taking or destruction is less than the amount of the Sums Secured immediately before the partial taking or destruction, the proceeds will be used to reduce the Sums Secured whether or not then due.

If I abandon the Property, or if I do not answer within 30 days, a notice from Lender stating that the Opposing Party (as defined below) offered to make an award to settle a claim for damages, Lender has the authority to settle any claim and collect the proceeds. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a legal action in regard to Miscellaneous Proceeds. Lender may then use the Miscellaneous Proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

I will be in default if any lawsuit or other legal proceeding is brought seeking Forfeiture of the Property or seeking any other significant reduction of Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" means a legal order or judgment that takes away some or all of my rights in the Property, whether in a civil or in a criminal proceeding. I can cure that default by causing the lawsuit or legal proceeding to be dismissed with a legal ruling that, in Lender's reasonable judgment, precludes any Forfeiture or any other significant reduction of Lender's interest in the Property or rights under this Security Instrument. If there is any award or claim for damages for the reduction of Lender's interest or rights, the proceeds of that award or claim are assigned to and will be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

Initials: 

-6(ME) (0011).01      Page 10 of 17      Form 3020 1/01

**12. Continuation of Borrower's Obligations and of Lender's Rights.**

**(a) Borrower's Obligations.** Lender may allow me, any Borrower, and any Successor in Interest of Borrower to delay or to change the amount of the Periodic Payments of principal and interest due under the Note or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Note and under this Security Instrument.

Lender may allow those delays or changes for a Successor in Interest of Borrower, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against a Successor in Interest of Borrower for not fulfilling obligations under the Note or under this Security Instrument, even if Lender is requested to do so by Borrower or a Successor in Interest of Borrower.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property; (2) Lender accepts payments from third Persons or Successors in Interest; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make immediate payment in full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower and of Persons Taking over Borrower's Rights or Obligations.** Except as provided in Section 18, any Successor in Interest of Borrower who takes over my rights or obligations under this Security Instrument in writing and who is approved by Lender will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. I will not be released from my liability under this Security Instrument unless Lender agrees to that release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument, except as provided in Section 20.

If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender can agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection, and valuation fees. In regard to any other fees, the fact that this Security Instrument does not expressly authorize Lender to charge a specific fee to Borrower should not be interpreted to be a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). My acceptance of any such refund made by direct payment to me will constitute a waiver of any right of action I might have arising out of such overcharge, unless Applicable Law expressly provides otherwise.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument must be in writing. Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless Applicable Law requires use of another method. The notice will be effective or "given" when mailed (or, if not mailed, when actually delivered) to my address, unless Applicable Law requires otherwise. Notice to any

Initials:

Doc#        14635
Bk:    3322 Pg:    281

one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice will be addressed to me at the address stated in the section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender a notice of my different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time.

Any notice that must be given to Lender under this Security Instrument will be given by delivering or mailing it to Lender's address stated in subsection (C) of the section above entitled "Words Used Often In This Document." A notice will be mailed or delivered to Lender at a different address if Lender gives me a notice of the different address. A notice to Lender required by this Security Instrument is not given until it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Interpretation.** This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of the Note conflicts with the Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence will not be construed as a prohibition against agreement by contract.

As used in this Security Instrument: (a) words of the masculine gender will mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular will mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** As used in this Section 18, "Interest in the Property" means any interest in the Property recognized or protected by Applicable Law including, for example, those interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, if the intent is the transfer of title by Borrower at a future date to a purchaser.

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any interest in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, Lender will not require immediate payment in full if prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement, following the procedures in Section 15. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) such other period as Applicable Law might specify for the termination of my right to reinstate; or (c) before a judgment has been entered enforcing this Security Instrument, if I meet the following conditions:

(1) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if immediate payment in full had never been required;

(2) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

Doc#      14635
Bk:    3322  Pg:    282

(3) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(4) I do whatever Lender reasonably requires to assure that Lender's Interest in the Property, Lender's rights under this Security Instrument, and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then the Note and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Section 18 above.

**20. Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Notice of Grievances.** The Note, or an interest in the Note, together with this Security Instrument, can be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects my Periodic Payments due under the Note and this Security Instrument and also performs other mortgage loan servicing obligations under the Note, this Security Instrument and Applicable Law is called the "Loan Servicer." There can be a change of the Loan Servicer as a result of the sale of the Note; there also can be one or more changes of the Loan Servicer unrelated to a sale of the Note. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under RESPA. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA in connection with a notice of transfer of servicing. If the Note is sold, the Purchaser may hire a third party as Loan Servicer. In that case, the Loan Servicer, and not the Note Purchaser, will have mortgage loan servicing obligations to Borrower, except when the Note or Applicable Law expressly requires otherwise.

Lender and I agree that we will not start a lawsuit or legal proceeding or join, or be joined to, an existing lawsuit (such as a class action) that arises from the other party's actions pursuant to the Security Instrument or that claims the other party broke any promise or failed to fulfill any duty under this Security Instrument or relating to the Security Instrument until: (a) the complaining party gives written notice in the manner provided in Section 15 to the other party; (b) the notice clearly describes the promise broken or the duty unfulfilled; and (c) the party receiving the notice is given a reasonable time to correct the problem. This provision does not apply if Applicable Law specifically authorizes a lawsuit by me against Lender under the facts in question and does not permit any cure or correction by Lender. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of default and opportunity to cure given to me pursuant to Section 22 and the demand for immediate payment in full given to Borrower pursuant to Section 18 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws."

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous or as pollutants or wastes by Environmental Laws and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances."



Doc# 14635
Bk: 3322 Pg: 283

An "Environmental Cleanup" includes any removal, remedial action or other response as defined in an Environmental Law. An "Environmental Condition" means a condition that can cause or contribute to or otherwise trigger an Environmental Cleanup.

Except as provided below: (a) I will not permit Hazardous Substances to be present on the Property; (b) I will not use or store Hazardous Substances on the Property; and (c) I will not allow anyone else to do so. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property.

I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so. I will not create an Environmental Condition affecting the Property or permit anyone else to do so or do anything which due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.

If I know of: (a) any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws; (b) any Environmental Conditions, for example, any spill or leak of any Hazardous Substance; or (c) any condition relating to a Hazardous Substance that reduces the value of the Property, I will promptly notify the Lender in writing. If the government or a private party notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

This Section does not require the Lender to conduct or pay for any Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** After the occurrence of the conditions stated in subsections (a), (b) and (c) below, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. If all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

Lender may also require immediate payment in full if any of the events described in Section 18 occur, even if the conditions stated in subsections (a), (b) and (c) below are not met.

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law. These costs include reasonable attorneys' fees and costs of title evidence.

Lender may require immediate payment in full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument, including the promises to pay when due the Sums Secured;

(b) Lender sends to me, in the manner described in Section 15 above, a notice that states:

(1) The promise or agreement that I failed to keep;

(2) The action that I must take to correct the default;

(3) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;

Initials: CM

Doc# 14635
Bk: 3322 Pg: 284

(4) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another Person may acquire the Property by means of foreclosure and sale;

(5) That if I meet the conditions stated in Section 19 above, I will have the right to have Lender's enforcement of this Security Instrument discontinued and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and

(6) That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering to the appropriate Registry of Deeds a discharge or release stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records (unless those costs were collected in advance of my loan closing).

**24. Payment During Foreclosure.** I agree that Lender may accept rents from the Property, hazard insurance proceeds, condemnation awards, and any other monies produced by the Property or paid by me, even though Lender has demanded immediate payment in full and begun foreclosure and sale under Section 22 above. Lender may use such monies to pay off any part of the Sums Secured without affecting Lender's right to continue foreclosure and sale.

**25. Riders to this Security Instrument.** The promises and agreements of each Rider are incorporated as a part of this Security Instrument.

Initials:

Doc# 14635
Bk: 3322 Pg: 285

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Security Instrument and in the Rider signed by me and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            Charles A. Mathieson            -Borrower

_____          _____ (Seal)
                                                                           -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower

Doc# 14635
Bk: 3322 Pg: 286

**STATE OF MAINE, Knox**                     County ss:

On this **28th**          day of **October 2004**          , personally appeared the above
named **Charles A. Mathieson**

and acknowledged the foregoing instrument to be his/her/their free act and deed.

Before me,

James W. Brannan
Justice of the Peace/Notary Public

Initials:

Doc# 14635
Bk: 3322 Pg: 287

## SCHEDULE A

A certain lot or parcel of land together with the buildings and improvements thereon, situated in Tenants Harbor, County of Knox and State of Maine, bound and described as follows:

BEGINNING at an iron pin located on the westerly side of Route 131, said iron pin being located at the southeast corner of land conveyed by Harlon E. Black, et al to Paul F. and Mary Kennon by deed dated October 1, 1981 and recorded in the Knox County Registry of Deeds at Book 843, Page 262; thence North 81 deg. 5 min. 30 sec. West by land of said Kennon 285.6 feet to an iron pin in a stone wall; thence North 69 deg. 54 min. West still by land of Kennon 252.68 feet to an iron pin; thence North 36 deg. 56 min. 30 sec. East still by land of Kennon 207.8 feet to a 1" iron pipe at land now or formerly of David Oaks; thence North 81 deg. 56 min. 30 sec. West by land of said Oaks 176.9 feet to a 5/8" iron rebar (to be set in the Spring of 1993); thence South 10 deg. 31 min. West by other land of Forzley 380 feet to a 5/8" iron rebar set in June, 1991; thence continuing the same course 50 feet, more or less, to a 5/8" iron rebar (to be set in the Spring of 1993); thence South 79 deg. 29 min. East by other land of Forzley 342 feet, more or less, to a 5/8" iron rod (to be set in the Spring of 1993) in a stone wall at land now or formerly of George Fay; thence North 8 deg. 44 min. East by land of George Fay to the point of intersection of two stone walls; thence South 87 deg. 12 min. 30 sec. East by a stone wall and still by land of Fay 291 feet to the westerly line of Route 131; thence northerly by said road approximately 127 feet to the place of beginning.

For reference see deed from Forzley to David W. MacDonald and Elisabeth A. MacDonald dated 8 March, 1993 and recorded at the Knox County Registry of Deeds, Book 1884, Page 15. Also see deed from MacDonald to MacDonald recorded in the Knox County Registry of Deeds, Book 1749, Page 207. David W. MacDonald is deceased, Elisabeth A. MacDonald is the surviving joint tenant.

Further reference is made to deed from Elisabeth A. MacDonald to Charles A. Mathieson to be recorded herewith.

KNOX SS: RECEIVED

Nov 01,2004
at 08:39:31A
ATTEST: LISA J SIMMONS
REGISTER OF DEEDS